## BAKER SALVAGE CO. *v.* THE TAYLOR DICKSON.

*(District Court, E. D. Virginia.   April 13, 1888.)*

1. SALVAGE—RELEASE OF RIGHT TO COMPENSATION.

   A towing company hired a tug to a salvage company for a compensation of so much per day whether at work or not, each party to be at liberty to terminate the service at its own pleasure.   At the beginning it was not definitely settled whether the tug was to work exclusively in connection with a vessel which the salvage company was trying to save, but for three weeks the tug was used in the general service of the salvage company.   The tug was then ordered to go to the assistance of the D., which was in distress, and bring her into port.   It went to the D. as the avowed agent of the salvage company, brought her in safely, and turned her over to that company, and, after the service was completed, presented and collected a bill for the *per diem* compensation for the entire time.   *Held,* that the towing company was precluded by their contract from claiming any of the award for the salvage of the D.

SAME—SEAMEN.

   But as the master and crew of the tug were employed for the ordinary business of the towing company, when it authorized the tug to be sent out in stormy weather for the purpose of rescuing a vessel there arose an implied permission on the part of the owners to the crew to receive the usual proportion of the salvage award; and as, under Rev. St. U. S. § 4535, seamen are rendered incapable of releasing their right to participate in the award, they are entitled to their proportionate share, viz., one-third, after deducting costs.

In Admiralty.   On the intervening petitions of the owners and master and crew of the steam-tug Sampson.

On the 25th of December last, the steam-tug Sampson, Capt. Joseph Delano, pursuant to orders received from the Baker Salvage Company of Norfolk, left this port to go after the schooner Taylor Dickson, then lying off Chicamicomico, on the North Carolina coast, flying signals of distress, with main and mizzen masts carried away.   The Sampson's orders were to proceed until she met the Victoria J. Peed, a strong wrecking steamer of the libelants, which they intended sending to the rescue of the Taylor Dickson, and to receive the rescued vessel from the Peed and tow her into Norfolk.   But the Sampson was ordered that, if the Peed should not have gone to the Taylor Dickson, then to go herself, say to her master that the Sampson had been sent by the Baker Salvage Company to take charge of her, and bring her into port.   The Peed was at the time lying off the coast between Cape Henry and Chicamicomico, waiting on the wrecked ocean steamer Kimberly; and the weather proved to be such that orders could not be sent to the Peed, as contemplated when the Sampson left Norfolk, and the Peed did not go to the Taylor Dickson.   It resulted that the Sampson went herself, took the schooner in tow, and brought her to Norfolk, where she arrived on the 27th December.   A libel was filed in this court on the 6th of January, 1888, by the Baker Salvage Company against the Dickson for salvage.

On the 20th January the American Towing Company of Baltimore, which is owner of the tug Sampson, filed a petition in the same cause, claiming that, out of the proceeds arising from the sale of the schooner Taylor Dickson and her cargo when sold, it should be paid "a liberal reward and compensation for having, with its tug and the officers and men employed by it, saved the said schooner, her cargo and crew, from loss and destruction." On the 27th of January another petition was filed in the same cause, in which the master and crew of the tug Sampson pray that they may be allowed to intervene for the assertion of their rights, and claiming a portion of the reward and salvage which may be decreed by the court in compensation for their own services rendered in saving the said schooner. By consent between libelant and petitioners the cause was first tried on the question of salvage, and the amount to be awarded; and a decree was rendered on the 9th of February allowing a gross sum of $3,600, of which the salvage reward was fixed at $3,000. See 33 Fed. Rep. 886. The case is now heard on the question of the distribution of this award.

The claim of the American Towing Company, owner of the Sampson, to any part of the award is resisted by the libelants, the Baker Salvage Company, on the ground that the Sampson was, at the time of rendering the service to the Taylor Dickson, under a general contract of charter with the Baker Salvage Company to render general salvage service at the rate of $100 a day; that the Sampson had been engaged in such service since the night of the 3d of December, and continued afterwards to be so engaged until the 27th of January, charging $100 a day for the whole period; that in pursuance of such contract the Sampson, when ordered to the rescue of the Taylor Dickson by the wrecking company in whose service it was, obeyed the order without protest, informing the master of the Dickson, on reaching her, that she was there by orders of the Baker Salvage Company; and that when the Sampson brought the Dickson into the port of Norfolk she delivered her to the Baker Salvage Company. On the other hand, the American Towing Company insist that the service for which they contracted with the salvage company was a special service of towing, to be rendered in connection with the wrecked ocean steamer Kimberly, then lying on the beach at False cape, and that alone; that the service rendered to the schooner Taylor Dickson was not embraced in their contract; and that they have a right to compensation for saving the schooner as a distinct and separate service from that which they had contracted to render to the Baker Salvage Company in connection with the Kimberly.

Counsel for the American Towing Company seem to have tried and argued the case on the hypothesis that, if the contract was for special service to the Kimberly alone, then the Sampson has a right to special compensation for saving the schooner; and, on the other hand, if the contract was that the Sampson should render service generally as it should be required by the Baker Salvage Company, then the $100 a day, charged for 53 days, should be treated as covering the compensation due for all service rendered by the Sampson. Let it be premised that about the

1st of December, 1887, the British steam-ship Kimberly, with a large cargo of cotton and grain, was beached on the Atlantic coast south of Cape Henry, near False cape, and that the Baker Salvage Company was on the 3d and 4th of December, and until the 27th of January, engaged in taking off her cargo and bringing it to Norfolk, and in hauling the steamer off from her perilous position, and towing her into port. It may also be premised that the American Towing Company owned, among other property, two steam-tugs,—the Raleigh and the Sampson. They were differently constructed; the Sampson being adapted exclusively to the purpose of towing, while the Raleigh was not only a sea-going towing steamer, but could also carry a moderate amount of freight, and was well adapted to the purpose of lightering vessels of their cargoes.

The business of the Baker Salvage Company was primarily that of general wreckers and salvors on the high seas, and they engaged in towing only as incidental to their wrecking and salvage operations. The business of the American Towing Company was primarily that of towing in Chesapeake bay, and adjacent waters; incidentally to which they occasionally engaged in saving vessels in distress in those waters. When the Baker Salvage Company found themselves, on the 3d of December last, in charge of the wrecked ocean steamer Kimberly and her cargo, it became necessary for them to increase their force of steam and sail vessels, and they addressed themselves at once to that necessity. Accordingly their secretary, Mr. George McBlair, telegraphed to the owners of two very strong steam-tugs in Philadelphia,—the Rattler and Battler,—and to the American Towing Company in Baltimore, owners of the Raleigh, inquiring on what terms they could obtain the use of those tugs. The Raleigh was desired on account of its capacity to carry a moderate amount of freight, as well as its capacity as a tug. On the same day on which McBlair sent his telegram relating to the Raleigh, the tug Sampson had come into Norfolk for the purpose of towing a raft of logs from there to Baltimore; but the weather was unfavorable for such work, and Capt. Delano, master of the Sampson, was willing, while waiting for better weather, to engage in other work which might present itself. On the 3d day of December, 1887, H. H. Petze, secretary of the American Towing Company, residing in Baltimore, received the telegram which has been mentioned, as sent by McBlair, secretary of the Baker Salvage Company, saying: "Wire what price you will furnish steamer Raleigh for lightering steamer Kimberly, quick." On the same day Petze answered by telegram that the Raleigh could not then be had. The master of the Sampson, Captain Delano, then in Norfolk, as has been stated, had telegraphed on the same day to Petze as follows, but without the knowledge of McBlair: "Raft ready this afternoon; wind east; cannot start; salvage company offer hundred dollars per day to wait on wrecked steamer. Answer." To this telegram of Delano, Petze answered next day, the 4th: "I would advise to accept offer of Baker Salvage Company." On the same day, the 4th December, McBlair telegraphed to Petze as follows: "What will you charter

Sampson for, week or ten days? Put it low. She is now towing schooner to wreck for us." Petze answered at once, "If Capt. Delano can arrange to have raft wait day or so for Hercules, will charter Sampson for $100." Not hearing from McBlair on the 4th, Petze telegraphed him on the 5th: "Is Sampson engaged on wreck? Answer quick, so that I may arrange about raft." To this McBlair answered on the 5th as follows: "Engaged by Salvage Company probably for some time. Send for raft." These three last telegrams, of the 4th and 5th December, viz.: the inquiry from McBlair, the answer from Petze, and the rejoinder from McBlair, determine whatever contract there was between the two companies at the outset of the chartering of the Sampson, which lasted for 53 days. Before these telegrams had been sent and received, Capt. Delano, of the Sampson, and Mr. Turner, president of the Baker Salvage Company, had, on the afternoon of the 3d December, concluded a negotiation for a mere temporary service of the Sampson. Capt. Delano testifies substantially in regard to this negotiation as follows:

"I cannot recollect exactly the words me and Mr. Turner had. On the afternoon of the 3d of December the office boy of the Baker Salvage Company came to the Sampson and told me that Mr. Turner wanted to see me. I went to the Old Dominion pier, and met Mr. Turner there. He asked me what I would tow the schooner Emily Johnson to the steamer on Currituck [the Kimberly] for. At first I asked him $12 an hour; but he said he thought that was quite steep, and he did not know there would be anything in it, but wanted to send the schooner down there. Then I told him that I came to Norfolk for a raft, and that the wind was blowing, and I did not think I could start it for two or three days, and that we had another tug, and that I would take this schooner down for him at one hundred dollars per day until I got back. Then Mr. Turner said it would probably last for a few days, and that he was satisfied at a hundred dollars; that that was what he had paid the Slater and others. I told him when he was ready to send orders; that I had steam, and was ready to go any time. So that night, about ten or eleven o'clock, I left Norfolk with the Emily Johnson for the steamer Kimberly, as it turned out to be, and then was when I sent the telegram, [alluding to the telegram heretofore mentioned as sent from him to Petze in Baltimore on the 3d December, saying that salvage company offer $100 per day to wait on wrecked steamer.]"

Capt. Delano further testified that he considered he was engaged especially to work on the Kimberly. Mr. Turner says, substantially, on this subject, as follows:

"On or about the 3d December I found that the exigencies of the service required that we should have more tug-boat service. I understood that Capt. Delano's tug was in the harbor, and, knowing him from his having done other work for us at different times, I sent for him to come to the office, and told him that I needed extra service,—that is, more tug service: that the Kimberly was ashore, and, in connection with that, we expected to have to tow and lighter her cargo. I asked him what he would charge me to enter into the service of the Baker Salvage Company. He said something about $12 an hour; but I said that would not do,—was too stiff,—and he finally agreed that he would hire himself to the Baker Salvage Company for one hundred dollars a day, boat and crew, and he was to furnish fuel. Then I said all right; that the terms seemed satisfactory; and that I would engage him, and let him know when ready, and as soon as we ordered him the pay

will begin. This was during Saturday afternoon, 3d December. I spoke about the schooner Emily Johnson, as I had already engaged her for lightering the cargo of the Kimberly, and about 11 or 12 o'clock 'that night, after the arrival of Mr. McBlair, the secretary, the tug was given the schooner Emily Johnson, and started for the Kimberly. I fully understood that the steamer Sampson was chartered for the Baker Salvage Company, and would have unhesitatingly started her on any service. The Sampson was chartered by the Baker Salvage Company per day for an indefinite period. We could stop when we liked,—one or the other could; and I understood the charter was to do any service that we might direct it to do."

Such had been the negotiations under which the Sampson went to work for the Baker Salvage Company. · Between the 3d and the 25th of December she was principally engaged in towing schooners out to the Kimberly and in from there, bringing away cotton from the Kimberly. The season was stormy, and the Sampson did nothing on a number of days when wind and tide prevented the work of lightering the Kimberly from going on. Whenever the Baker Salvage Company had other work for the Sampson to do when thus disengaged, they called upon her to do it. She did the work, and the bills for such service were collected by the Baker Salvage Company. Several jobs of towing were thus done by the Sampson in Norfolk harbor. On one occasion she went below Lambert's point, and pulled the Old Dominion steamer Roanoke off shore where she had grounded. She also towed a large vessel (the Harvester) from Lynnhaven bay, where she was in distress, to anchorage near Thimble Light in Chesapeake bay. She did every job of this sort whenever called upon by the Baker Company; making no objection that she had been employed only to work on the Kimberly, and making no claim to the earnings which the Baker Salvage Company were collecting for such jobs. On the 25th December the Baker Salvage Company received intelligence of the distress which the schooner Taylor Dickson was in off Chicamicomico. The Baker Salvage Company's wrecking steamer Victoria J. Peed was then off False cape, pulling on cables from the Kimberly whenever practicable, and waiting on the Kimberly, engaged in the work of saving ship and cargo. Mr. McBlair, on hearing of the condition of the Taylor Dickson, determined to order the Peed to proceed from False cape to Chicamicomico to her assistance, and then to bring her on up the coast until she should meet the Sampson, when the Sampson should receive her from the Peed, and bring her to Norfolk. Capt. Delano was sent for by Mr. McBlair on the 25th of December, informed of the condition of the Taylor Dickson, instructed as to McBlair's design of sending the Peed to the Dickson, and directed to get up steam and proceed out to sea until he should meet the Peed, and to receive the Dickson from the Peed and bring her to Norfolk. He was further directed that, in the contingency that the Peed should not go to the Dickson, he should himself go after her, and, on arriving where she was, to say to her master that the Sampson was sent by the Baker Salvage Company, and to make no contract with her. Capt. Delano accepted these orders, at once set about executing them, was furnished with a reliable hawser by the Baker Salvage Company, (the

Sampson's hawser not being long enough or safe,) and went to the Dickson, informed her that he was there by orders of the Baker Salvage Company, took her in charge on the 26th of December, brought her into Norfolk on the 27th, and delivered her over to the Baker Salvage Company here. The charter of the Sampson terminated on the 26th of January following, when the wrecked steamer Kimberly was finally brought into this port. The master of the tug soon after presented his account to the Baker Salvage Company for the service of the Sampson, 53 days from the 3d of December, at $100 per day. This bill was sent by McBlair to Petze, but although called for was not produced in evidence. By the 7th of January, 35 days after the commencement of work by the Sampson, Petze had drawn for or had been paid as much as a total of $2,500, and seemed to be disposed to draw for another $1,000. In this correspondence Petze made no claim to share in the salvage for the Dickson. This $3,500 would have been the compensation due up to that time at $100 per day, for a period which included the days of the Sampson's trip to Chicamicomico. On the 4th of February Petze was paid an additional $1,000 to the $2,500 previously received, which leaves $1,800 still due the owners of the Sampson. There seems to have been no dispute of accounts between the two companies. The American Towing Company has never deducted the *per diems* which would not have been earned if the Sampson had not been in the service of the Baker Salvage Company during her expedition after the Taylor Dickson on the 25th, 26th, and 27th of December.

*Thos. H. Willcox, Harmanson & Heath,* and *A. R. Hunckle,* for petitioners.

*Sharp & Hughes,* for Baker Salvage Co.

HUGHES, J., (*after stating the facts as above.*) From this epitome of the testimony taken in the case, I am of the opinion that at the beginning of the service of the Sampson there were but two points of contract mutually agreed upon and understood between the Baker Salvage Company and the American Towing Company,—which were, that the compensation of the Sampson was to be $100 a day, whether at work or not; and that each party was at liberty to terminate the service at its own pleasure. I am also of the opinion that at the beginning the question whether the Sampson should work exclusively on the Kimberly job, or was to do whatever the Baker Salvage Company should have for her to do in the way of towing and wrecking, was not definitely settled, upon a common understanding of both parties. I am of opinion, moreover, that in the progress of the service, and quite early in its progress, the acts of the parties tacitly decided this unsettled question; for I think that the frequent orders of the Baker Salvage Company to Capt. Delano to perform work that had no relation to the Kimberly, and his performance of such work without objection during a period of three weeks between the 3d and the 25th of December, put an interpretation upon the contract which the American Towing Company cannot now reasonably dispute. By the 25th of December it had become settled by the acts of

both parties that the Sampson was employed in the general service of the Baker Salvage Company, and not exclusively in the business of lightering the cargo of the Kimberly; and I think this was so, independently of the fact that no person connected with shipping and navigation in the Chesapeake and its waters could fail to know that the Baker Salvage Company was a wrecking, as distinguished from a towing, company, and was principally engaged in wrecking enterprises on the outer waters of the Atlantic. An engagement to serve a company thus habitually engaged, for an indefinite period, at the price of $100 a day, work or no work, would seem necessarily to imply service in more than one enterprise; would seem necessarily to imply service in the general wrecking business of that wrecking company. But, independently of this cogent consideration, and even although it were at first in the mind of the Sampson's owners that she should serve exclusively in the Kimberly enterprise, still the acceptance and execution of orders to do other work for a period of three weeks, without objection or protest, seems to me to establish the conclusion that the service was a general service, and not a particular one only. The service having gone on upon this basis for three weeks, then came the order to the Sampson to go out to meet the Peed, and to take from her the Taylor Dickson; or, if the Peed should not have gone to Chicamicomico, then to continue on to that point herself, and save and bring in the Taylor Dickson. The acceptance and performance of this service by the Sampson, without objection or protest, was an additional proof that the service in which the Sampson was engaged was the general service of the Baker Salvage Company. The master of the Sampson was at liberty, under the contract, to terminate the service at the time of receiving the order to go for the Taylor Dickson. He did not terminate it, but continued the service. He went to Chicamicomico as the avowed agent and servant of the Baker Salvage Company. He saved and brought in the schooner at the command of the salvage company, and delivered her to that company. In presenting his bill for his whole service, ending on the 26th January, Capt. Delano treated the period of his trip to Chicamicomico as part of the time for which the compensation of the Sampson was $100 per day. The correspondence between Petze and McBlair on, and a few days after, the 7th of January, proceeded on the basis of $100 a day being due up to that time, and no claim was made or intimated by Petze that for any of the days constituting the period between 3d December and 7th January the $100 was not due. In fact no intimation was given either by Capt. Delano or by Petze, before the filing of their petition, that any exceptional service had been rendered by the Sampson that was not covered by the contract for $100 a day.

It is clear to me, therefore, that the owners of the Sampson are precluded by their contract with the libelants, as well as by the equities of the case, and the ordinary considerations of fair dealing, from claiming, as against their employers, the Baker Salvage Company, any portion of the salvage award that has been decreed in this cause, and I will so decree.

The claim of the master and crew of the Sampson, set up in their petition, stands, I think, on a better footing. The ordinary business of the American Towing Company of Baltimore, of which the master and crew of the Sampson were employes, was that of towing in the Chesapeake bay, and the rivers and harbors tributary to the bay. Their contract with the company was in contemplation of such service,—that of towing vessels within the capes. As long as the Sampson was employed in these inland waters, no extraordinary labor, skill, or risk was involved; but, when the owners of the Sampson authorized her to be sent outside of the capes, on extraordinary service, down the coast in stormy weather, for the purpose of rescuing a vessel in distress, and in fact engaging in a wrecking and salvage service, all without consulting the crew of the Sampson, there arose, independently of any existing statutes on the subject, an implied permission on the part of the owners to the crew to demand and receive the usual proportion of whatever salvage money might accrue from such expedition. While the owners of a ship may release, by express or implied contract, a claim for salvage, yet the seamen of a vessel which saves another are rendered incapable, by section 4535 of the Revised Statutes of the United States, of releasing their claim to participate in any salvage that may accrue from the enterprise. A decree may therefore be taken in favor of the master and crew of the Sampson for one-third of the reward of $3,000, after deducting costs, which was decreed in this cause on the 9th February last.

On appeal to the circuit court, the foregoing decision was affirmed.